Oct. 4, }
 1911. }

## OPINION OF THE JUSTICES.

The fact that an act is found in the office of the secretary of state with other public acts passed at the same session, and that it is signed by the speaker of the house and the president of the senate, with the approval of the governor attested by his signature thereon, is not conclusive evidence of its due enactment.

The journals of the two houses of the legislature are to be treated as authentic records of the proceedings; and when it appears from them that an act was not passed by both branches of the legislature, the *prima facie* evidence furnished by its enrollment is overcome and it must be held invalid.

In reaching the conclusions contained in opinions required by the governor and council under article 73 of the constitution, the justices of the supreme court are not authorized to receive evidence or to determine questions of fact.

Where both houses of the legislature amend a bill by striking out a limitation upon an appropriation authorized by the measure, but the act as engrossed and signed by the governor contains the limitation in its original form, the entire provision for an expenditure is invalid, even to the extent permitted by the limiting clause.

An act cannot be presented to the governor for his signature after a final adjournment of the legislature.

The justices of the supreme court will not ordinarily give their opinions to the governor and council upon a question involving private rights.

*To the Justices of the Supreme Court:*

The governor and the honorable council respectfully represent that on March 16, 1911, an act entitled "An act to provide for the acquisition by the state of the Crawford Notch, so called, in Hart's Location and contiguous territory, as a forest reservation and state park" was reported by the committee on appropriations to the house. Section 3 of this bill provided: "For the purpose of carrying out the provisions of this act, such a sum as may be necessary, not to exceed one hundred thousand dollars ($100,000), is hereby appropriated and shall be provided in the manner following: The state treasurer, under the direction of the governor and council, shall issue scrip or certificates of indebtedness to such amounts as may be necessary to pay for the lands, wood, and timber purchased or condemned as aforesaid, not exceeding in the aggregate the amount aforesaid."

The house voted to amend said section by striking out the words "not to exceed one hundred thousand dollars," and to further amend

said section by striking out the words "not exceeding in the aggregate the amount aforesaid," and passed the bill. The clerk of the house messaged the bill into the senate, and instead of striking out the words above named on the face of the bill, he pasted a printed extract from the house journal, showing the amendments, to the wrapper of the bill. The bill reached the senate April 4, 1911, was read twice by its title, and sent to the finance committee. April 6, 1911, that committee reported the bill to the senate, and it was read a third time by its title and passed unanimously. In engrossing the bill the record attached to the wrapper of the bill was not noticed, and it was engrossed as it was when it was reported by the committee on appropriations. The engrossing committee reported to the house and senate that they found the bill correctly engrossed. The house and senate accepted this report, the president of the senate and the speaker of the house signed this bill, and it was presented to the governor and signed by him.

The governor and council require the opinion of the justices upon the following questions;

1. Is this act, entitled "An act to provide for the acquisition by the state of the Crawford Notch, so called, in Hart's Location and contiguous territory, as a forest reservation and state park," approved April 12, 1911, a valid law?

2. If in your opinion the bill as engrossed and signed by the governor is not the one which passed the house and senate, can the governor and council pledge the credit of the state to the extent of one hundred thousand dollars to carry the bill into effect?

3. If no part of the act is now the law, may the act be correctly engrossed now and presented to the governor for his signature?

4. If the record is conclusive that the act as signed by the governor passed the house and senate, can the lands specified in said bill be acquired by the exercise of eminent domain, if the owners of said lands ask therefor a sum greatly in excess of the one hundred thousand dollars specified in said bill?

> ROBERT P. BASS, *Governor.*
>
> THOMAS ENTWISTLE,
> HARRY T. LORD,
> BENJAMIN F. GREER,    } *Councilors.*
> JOHN M. GILE,
> GEORGE H. TURNER,

Concord, N. H., August 4, 1911.

*To His Excellency the Governor, and the Honorable Council:*

In response to your inquiries relating to the validity of an act entitled "An act to provide for the acquisition by the state of the Crawford Notch, so called, in Hart's Location and contiguous territory, as a forest reservation and state park," approved by the governor April 12, 1911, and your powers thereunder, the undersigned, the justices of the supreme court, respectfully answer as follows:

Upon three occasions, the first over fifty years ago, the justices of this court, in performance of their constitutional duty upon the requirement of each branch of the legislature or the governor and council, have joined in expressing the opinion, that the fact that an act was found lodged in the office of the secretary of the state with other public acts passed at the same session, signed by the speaker of the house of representatives and the president of the senate, with the approval of the governor attested by his signature thereon, was not conclusive evidence of its due enactment; but that, in view of provisions of the constitution in reference to them, the journals of the two houses are to be treated as authentic records of the proceedings, and that if it appears from these records that the act in question was not passed by both branches of the legislature, the *prima facie* evidence furnished by the enrolled act would be overcome and the act held invalid. *Opinion of the Justices*, 35 N. H. 579; *Opinion of the Justices*, 45 N. H. 607; *Opinion of the Justices*, 52 N. H. 622. In view of the entire unanimity of opinion extending over so long a period of time, participated in by so many different members of the court, and apparently accepted and acquiesced in by the bar and the state, we may properly adopt as our own, without further discussion, the views upon this question expressed by our predecessors in 1858, approved by them in 1864, and reaffirmed in 1873.

In reaching the conclusions contained in opinions of this character, the justices are not authorized to receive evidence or to determine questions of fact. *Opinion of the Justices*, 70 N. H. 638; *Opinion of the Justices*, 45 N. H. 607, 608, 614. Assuming, therefore, that the journal of the house shows the fact stated in your communication, —that certain provisions of the act now published as chapter 130 of the Laws of 1911, found in the act as enrolled and published, were stricken from the act by amendment in the house before its passage by that branch of the legislature,—the provisions so stricken out are not law. Our answer therefore to the first question submitted

is that in our opinion chapter 130 of the Laws of 1911 is not in its entirety, as published, a valid law. We see nothing in the facts stated as to the proceedings in the senate which would authorize the finding that the act which passed the house did not duly pass the senate. The senate are authorized by the constitution to "determine their own rules of proceedings." *Art.* 36 [37]. There is nothing in the constitution prescribing the method which the senate must adopt to acquaint themselves with the contents of any proposed measure before its passage.

Our attention is called to section 3 of the act, which appears to have been drafted for the purpose of appropriating money to carry out the purposes of the act and to provide the same by authorizing the state treasurer, under the direction of the governor and council, to issue scrip or certificates of indebtedness therefor. The second question asked, whether the governor and council can "pledge the credit of the state to the extent of $100,000 to carry the bill into effect," under the facts submitted presents the inquiry whether upon the facts stated section 3 authorizes the governor to draw his warrant for such sum, or the state treasurer to issue scrip or certificates of indebtedness to that amount. The differences between the act as passed by the house and the bill approved by the governor in this section are stated to be, that the bill passed appropriated for the purpose of carrying out the provisions of the act "such a sum as may be necessary" and authorized the issue of scrip or certificates of indebtedness "to such amounts as may be necessary to pay for the lands, wood, and timber purchased or condemned"; while in the bill as signed the limitation "not to exceed one hundred thousand dollars" is attached to the first clause quoted, and to the second is added "not exceeding in the aggregate the amount aforesaid," these being the clauses which were struck out in the house and which, as stated, are not law. The question is whether under the circumstances the remainder of the section is of any validity.

"It will sometimes be found that an act of the legislature is opposed in some of its provisions to the constitution, while others, standing by themselves, would be unobjectionable. So the forms observed in passing it may be sufficient for some of the purposes sought to be accomplished by it, but insufficient for others. In any such case the portion which conflicts with the constitution, or in regard to which the necessary conditions have not been observed, must be treated as a nullity. Whether the other parts of the statute must also be adjudged void because of the association must depend upon

a consideration of the object of the law, and in what manner and to what extent the unconstitutional portion affects the remainder. . . . The constitutional and unconstitutional provisions may even be contained in the same section and yet be perfectly distinct and separate, so that the first may stand though the last fall. . . . If they are so mutually connected with and dependent upon each other . . . as to warrant the belief that the legislature intended them as a whole, and if all could not be carried into effect the legislature would not pass the residue independently, then if some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them." Cool. Con. Lim. (6th ed.) 209–212; *Copp* v. *Henniker*, 55 N. H. 179, 203; *East Kingston* v. *Towle*, 48 N. H. 57, 65.

In the absence of evidence of the facts by which under the constitution laws may be enacted without the governor's approval, his approval attested by his signature is as essential to the valid enactment of a law as its passage by each branch of the legislature. "Every bill which shall have passed both houses of the general court shall . . . be presented to the governor; if he approve, he shall sign it." Const., *art.* 43 [44]. The section 3 which the governor approved confers only a limited authority. His approval of an act conferring such an authority cannot be construed as an approval of an act conferring an unlimited one. The authority conferred by the act signed by him is directly dependent upon the limitation. When the limitation is destroyed, the power dependent thereon goes with it. It cannot be said on the evidence furnished by the act that without the limitation the section would have met gubernatorial approval. It may be argued that the act as it passed the general court discloses an intention to appropriate and to authorize the issuing of scrip or certificates to the amount of $100,000 at least, if necessary, because the only limitation is "such sum as may be necessary," and as the governor's signature to the bill presented evidences his approval of the provisions of the section up to $100,000, all portions of the law-enacting body have approved action under the section to that amount at least, and hence any acts which do not pledge the credit of the state beyond that sum would be within the intent both of the governor and the general court. This may be so; but mere intent of the general court and the executive will not enact a valid law. That intent must be expressed as the constitution directs. If the bill as passed had been presented to the governor and he had the belief that the limitation should be included in it, he

had no power to attach that limitation to his signature, because he is compelled under the constitution to approve or disapprove the bill as a whole.  The only method by which his purposes as to the limitation, if he entertained any, could be enacted into law would be the return of the bill with his objections, their removal by action of the two houses, and the subsequent presentation to and approval of the amended bill by him.  These forms prescribed by the constitution are not supplied by the error in engrossing the bill.  Our opinion is that section 3 is all invalid.  Authority therefore cannot be found therein to draw money from the treasury, or to issue scrip or certificates of indebtedness in payment "for the lands, wood, and timber purchased or condemned" under the act.

The third question submitted is: "If no part of the act is now the law, may the act be correctly engrossed now and presented to the governor for his signature?"

There are a number of conflicting decisions under constitutional provisions substantially similar to our own, in which the question whether the governor may after final adjournment of the legislature sign a bill duly presented to him before adjournment is considered. Note, 37 L. R. A. 391.  Those like *Fowler* v. *Peirce*, 2 Cal. 165, which hold that the governor cannot sign a bill after the adjournment, are of course conclusive of the present question.  Although this conclusion is supported by the invariable practice in this state, the question may now be passed.  No bill can become a law that is not presented to the governor.  As the constitution confers no authority upon any person to present bills to the governor, they must be presented by the legislature, or by some person by authority derived from the legislature.  The constitutional question whether the legislature could authorize the presentation of bills to the governor after its adjournment does not arise, except as an aid to the construction of provisions or rules governing the matter, until it appears attempt has been made to authorize such presentation. Under article 43 [44] of the constitution, it is the governor's duty, if he does not approve a bill, to return it to the house in which it originated, with his objections.  It is not only his duty, but his right, under the power entrusted to him as part of the law-making instrumentality of the constitution.  Although by adjournment with his consent within less than five days after the presentation of a bill he may, as a practical proposition, be deprived of sufficient time to state his objections, it would require very express language to lead to the inference that the legislature, in providing for the

presentation of bills to the executive, intended to authorize their presentation in such manner as to wholly deprive him of the power to aid in shaping legislation by calling the attention of the legislature to defects in measures adopted by them.

The present statute (Laws 1893, *c.* 64) requires the secretary of state to cause all bills and joint resolutions which have passed both branches of the legislature to be engrossed, and after they have been engrossed and signed by the speaker of the house and the president of the senate, to present them to the governor for approval. The act does not say when they shall be presented; but there is no evidence of any purpose in the act of 1893 except to substitute the secretary of state for the engrossing clerk of both houses and to impose upon him the duty of presentation formerly resting upon the clerk of the senate. P. S., *c.* 4, *ss.* 8, 9. By the latter section, the clerk of the senate, whose duty it was to present bills to the governor, was required to make on the bill a certificate of the day and hour of so doing and to make a corresponding entry upon the records of the senate. With the adjournment of the senate its records were closed, and the entry required thereon seems to us a plain intimation that the act to be recorded must be done before adjournment. In *Lankford* v. *County*, 73 Md. 105,—11 L. R. A. 491, the court took an opposite view of such a provision, based in part upon the contrary practice in that state both before and after the statute was passed. Here we have been able to discover no evidence of a practice of presenting bills after the adjournment of the legislature. We think it has never been attempted. We are aware of only one instance in which it was suggested that a governor might after adjournment sign a bill duly presented to him, but which he had declined to sign before adjourning the two houses. In this case the governor refused to act.

The section of the Public Statutes placing the duty of presentation upon the clerk of the senate and requiring him to enter the time of presentation upon the senate record was originally adopted in 1864. Laws 1864, *c.* 4034. It probably resulted from the controversy over the attempted veto by the governor of chapter 4030, Laws 1864, known as the soldiers' voting bill. *Opinion of the Justices*, 45 N. H. 607. We have been unable to discover any earlier statute upon the subject. It is to be remarked that the constitution contains no provision as to the attestation of bills. It does not require them to be engrossed or signed by the presiding officers of the two houses. That matter is left to the legislature for

regulation. The journals in the years immediately following the adoption of the constitution are not complete enough to furnish an exact history of the procedure; but as early at least as 1824 there was a joint rule, substantially in the language of the sixth joint rule of the last session, providing for a committee for the purpose of engrossing bills and their signature when engrossed by the presiding officers of the two houses. App. Senate Jour., June, 1824, *p.* 107. From that time until the next session after the passage of the act placing the duty of presentation upon the clerk of the senate, the journals record that the bills, after signing by the president of the senate, were delivered to the committee on engrossed bills, to be laid before the governor for his approval and signature. This committee reports from time to time the performance of its duty, and at the end of the session reports that it has presented to the governor all engrossed bills, resolutions, and addresses which have been reported engrossed and signed by the presiding officers of the houses. Senate Jour., July, 1864, *p.* 127.

It thus appears that when the act of 1864 was passed the presentation of bills to the governor was understood to be a legislative duty, to be performed by a committee of the general court and to be completed before adjournment. That act, as stated, clearly implies that the presentation authorized is to be made before adjournment, and the subsequent alterations in the law furnish no evidence of an intent to authorize a change in this respect. For the reason, therefore, that no authority has been conferred upon the secretary of state to present bills after the adjournment of the legislature, without reference to the constitutional question whether such power could be given, we think the third question must be answered in the negative.

It may, however, be remarked that under the constitution neither house can adjourn itself for more than two days at a time; that the power of adjourning the legislature is vested in the governor, who, with the advice of the council, upon request of both houses may adjourn the general court to such time as they agree upon, or, in case of disagreement between the two houses, may adjourn it for such time as he may determine the public good may require, not exceeding in the latter case ninety days at any one time. Const., *arts.* 18 [19], 35 [36], 42 [43], 49 [50]. The practice has been for the two houses, when they have agreed upon adjournment, to inform the governor of the fact, whereupon he sends a message to each house adjourning the general court in accordance therewith. In every instance since

1815, and with only a few exceptions prior thereto since 1800 up to 1911, the governor in this message has informed the two branches of the legislature of the disposition of the bills and resolves that have been presented to him. This seems to show that the constitution for over a hundred years has been understood to mean that upon the adjournment of the general court by the governor the business of making law was ended for that session.

Our conclusion that the enrolled act is not conclusive renders the fourth question immaterial. Whether, under sections of the act to which our attention has not been called and existing statutory provisions, proceedings *in invitum* can be maintained for the taking of Crawford Notch, involves a question of private right in the landowners, which, if asked, we should ordinarily feel obliged to decline to answer. *Opinion of the Justices, ante, 597; Opinion of the Justices,* 70 N. H. 638; *Opinion of the Justices,* 62 N. H. 704. That question can be finally determined only in the course of litigation to which the landowners are parties. Our views thereon have not been required and we have not intended to express any opinion.

FRANK N. PARSONS.
REUBEN E. WALKER.
GEORGE H. BINGHAM.
JOHN E. YOUNG.
ROBERT J. PEASLEE.

October 4, 1911.