Merrimack
No. 2004-707

ROBERT A. BAINES, MAYOR OF THE CITY OF MANCHESTER & a.

v.

NEW HAMPSHIRE SENATE PRESIDENT

Argued: February 16, 2005
Opinion Issued: April 20, 2005

*Nixon, Raiche, Manning, Casinghino & Leach, P.A.*, of Manchester (*David L. Nixon* and *Leslie C. Nixon* on the brief, and *Ms. Nixon* orally), and *Wensley, Wirth & Azarian, P.L.L.C.*, of Rochester (*Danford J. Wensley* on the brief and orally), for the petitioners.

*Kelly A. Ayotte*, attorney general (*Anne M. Edwards*, associate attorney general, and *Laura E. B. Lombardi*, assistant attorney general, on the brief, and *Ms. Edwards*, orally), and *Richard J. Lehmann*, senate legal counsel, by brief, and *Patrick Donovan*, house legal counsel, by brief, for the State.

*Richard J. Lehmann*, senate legal counsel, on the joint brief and orally, for the President of the New Hampshire Senate.

*Patrick Donovan*, house legal counsel, on the joint brief, for the Speaker of the New Hampshire House of Representatives.

NADEAU, J. The petitioners, the Cities of Manchester and Rochester and their mayors, appeal the order of the Superior Court (*McGuire*, J.) denying their petition for a declaration that Laws 2004, chapter 200 is unconstitutional. We affirm.

The petitioners argue that Laws 2004, chapter 200 is unconstitutional because, as a "money bill," the constitution requires that it originate in the New Hampshire House of Representatives (House) and because it differs materially from the bill the legislature passed. We conclude, however, based upon the facts of this case, that when this law became a "money bill," it originated in the House and it did not differ materially from the bill the legislature passed. Accordingly, we affirm the trial court's conclusion that the law is constitutional. We do not address the petitioners' arguments

concerning the legislature's alleged violations of procedural statutes because we conclude that these arguments raise nonjusticiable political questions.

*I. Factual Background*

The record supports the following facts. Laws 2004, chapter 200 began as Senate Bill (SB) 302, which was introduced in the New Hampshire Senate (Senate) on January 7, 2004, to "mak[e] technical corrections to the education funding formula." N.H.S. JOUR. 4 (2004). As introduced, SB 302 changed neither the source of education funding revenue, the statewide property tax, nor the uniform rate at which the tax was imposed.

The Senate passed SB 302 on March 17, 2004. *See* N.H.S. JOUR. 574-97 (2004). Before doing so, the Senate considered and rejected an amendment that would have raised the existing cigarette tax rate. *See id.* When SB 302 was transmitted to the House, it did not include this amendment.

SB 302 was introduced into the House on March 18, 2004. *See* N.H.H.R. JOUR. 522 (2004). On May 6, 2004, the House passed the bill with its own amendment increasing the existing cigarette tax rate. *See* N.H.H.R. JOUR. 810-28 (2004).

When the Senate next considered SB 302, on May 6, 2004, it did not concur with the House amendments. *See* N.H.S. JOUR. 1132 (2004). A committee of conference (Conference Committee) was then appointed. *See id.* The Conference Committee filed its report on May 19, 2004. *See* N.H.S. JOUR. 1219 (2004).

The Conference Committee recommended a new amendment to SB 302, which replaced all of the bill's language after the enacting clause. *See* N.H.S. JOUR. 1219-64 (2004); *see also* N.H.H.R. JOUR. 857-67 (2004). As amended by the Conference Committee, the bill increased the uniform rate at which the statewide property tax would be imposed. *See* N.H.H.R. JOUR. 857, 864 (2004); *see also* Laws 2003, 241:11. The Conference Committee's version of SB 302 was first adopted by the House and later by the Senate. *See* N.H.S. JOUR. 1219-64 (2004); *see also* N.H.H.R. JOUR. 857-67, 898 (2004).

There was a discrepancy between the text of SB 302 presented to the legislature and the Conference Committee's spreadsheet showing how much State money each municipality would receive under the bill. *See* N.H.H.R. JOUR. 897 (2004). The discrepancy concerned the formula for targeted aid to property poor municipalities. *See* RSA 198:41 (Supp. 2004). While the Conference Committee's spreadsheet calculated targeted aid by *including* property subject to taxation under RSA chapter 82 (taxation of

railroads) and RSA chapter 83-F (electricity consumption tax), the text of SB 302 provided that targeted aid would be calculated by *excluding* this property. *See* N.H.H.R. JOUR. 897 (2004).

The House Journal refers to the discrepancy in the following clerk's note:

> The Speaker indicated that a discrepancy had been found between the spreadsheet used by the Committee of Conference on SB 302 and the actual language of the report. It was the intent of the Committee of Conference that the language include utility property in order to convey the results enumerated on the spreadsheet.
>
> The Clerk was instructed to note this for the record, and was given a copy of the spreadsheet to keep on file.

*Id.* The Senate Journal includes the Conference Committee's spreadsheet. *See* N.H.S. JOUR. 1309-13 (2004).

Both the House and Senate recessed on May 25, 2004, for the purposes of receiving enrolled bill amendments and reports. *See* N.H.S. JOUR. 1302-08 (2004); *see also* N.H.H.R. JOUR. 898-99 (2004). The enrolled bills committee recommended changing the word "excluding" to "including" in two places in SB 302 to fix the discrepancy between the Conference Committee's spreadsheet and the bill's text. With this change, SB 302 provided for calculating targeted aid by "including" property subject to taxation under RSA chapter 82 and RSA chapter 83-F. The enrolled bills committee recommended additional amendments to SB 302 to integrate changes made by other bills.

On June 3, 2004, the enrolled bills committee recommended that SB 302, as amended, ought to pass. *See* N.H.S. JOUR. 1340 (2004); N.H.H.R. JOUR. 899 (2004). The May 25, 2004 House and Senate sessions continued until they were adjourned on June 17, 2004. *See* N.H.S. JOUR. 1340 (2004); *see also* N.H.H.R. JOUR. 907 (2004). The journals of both houses indicate that the enrolled bill amendments to SB 302 were adopted before the May 25, 2004 session was adjourned. *See* N.H.S. JOUR. 1316-17 (2004); N.H.S. JOUR. 1340 (2004); *see also* N.H.H.R. JOUR. 899 (2004). The New Hampshire Secretary of State presented SB 302, as amended, to the Governor; it was enacted without his signature on June 9, 2004. *See* N.H. CONST. pt. II, art. 44.

On appeal, the petitioners argue that Laws 2004, chapter 200 is unconstitutional because: (1) it is a "money bill" that should have originated in the House as required by Part II, Article 18 of the State

Constitution; and (2) it is materially different from the bill that the legislature passed and thus violates Part II, Articles 2, 20, 37 and 44 of the State Constitution as well as RSA 14:8 (2000) and RSA 20:2-a (2000). Before reaching the merits of the petitioners' claims on appeal, we address whether they are justiciable.

*II. Justiciability*

Two respondents, the Senate President and the House Speaker, argue that the petitioners' claims are nonjusticiable. The petitioners counter that we cannot address this argument because it was not preserved for our review. While we agree that the argument was not preserved, we will address it.

Ordinarily, we will not review arguments that were not timely raised before the trial court. *See N. Country Envtl. Servs. v. Town of Bethlehem*, 150 N.H. 606, 619 (2004). This rule is not absolute, however. We will, for instance, review subject matter jurisdiction claims, even if raised for the first time on appeal. *See Route 12 Books & Video v. Town of Troy*, 149 N.H. 569, 575 (2003). Moreover, preservation "is a limitation on the parties to an appeal, not the reviewing court." 5 AM. JUR. 2D *Appellate Review* § 691 (1995). We exercise our discretion in this case to address whether the questions on appeal are justiciable because justiciability is essentially a jurisdictional issue. *See Petition of Judicial Conduct Comm.*, 151 N.H. 123, 128 (2004). If a question is not justiciable, it is not ours to review. *See id.* As with other kinds of jurisdictional questions, such as subject matter jurisdiction or sovereign immunity, we may address justiciability even if this issue is raised for the first time on appeal.

■ "[T]he political question doctrine is essentially a function of the separation of powers, existing to restrain courts from inappropriate interference in the business of the other branches of Government, and deriving in large part from prudential concerns about the respect we owe the political departments." *Nixon v. United States*, 506 U.S. 224, 252-53 (1993) (Souter, J., concurring) (quotations and citations omitted). "In the New Hampshire Constitution, the principle of separation of powers is espoused in Part I, Article 37." *Horton v. McLaughlin*, 149 N.H. 141, 143 (2003). The justiciability doctrine prevents judicial violation of the separation of powers by limiting judicial review of certain matters that lie within the province of the other two branches of government. *Petition of Judicial Conduct Comm.*, 151 N.H. at 128.

Cases that raise nonjusticiable political questions have the following characteristics:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).

The Senate President and House Speaker first argue that the question of whether Laws 2004, chapter 200 violates Part II, Article 18, because it is a "money bill" that should have originated in the House, is nonjusticiable. It is our constitutional duty, however, to review whether laws passed by the legislature are constitutional. *See United States v. Munoz-Flores*, 495 U.S. 385, 391 (1990). "We are the final arbiter of State constitutional disputes." *Petition of Below*, 151 N.H. 135, 139 (2004). "While it is appropriate to give due deference to a co-equal branch of government as long as it is functioning within constitutional constraints, it would be a serious dereliction on our part to deliberately ignore a clear constitutional violation." *Consumer Party of Pennsylvania v. Comm.*, 507 A.2d 323, 333 (Pa. 1986). The United States Supreme Court reached a similar conclusion in *Munoz-Flores* when it held that whether a particular piece of legislation violated the Origination Clause of the Federal Constitution presented a justiciable question. *Munoz-Flores*, 495 U.S. at 390-91; *see* U.S. CONST. art. I, § 7.

■ Reviewing whether the disputed legislation violates Part II, Article 18 does not demonstrate lack of respect due the legislative branch of government. Rather, it fulfills the constitutional responsibility of the judicial branch. *Munoz-Flores*, 495 U.S. at 390. Legislative consideration of constitutional questions "does not foreclose subsequent judicial scrutiny of the law's constitutionality." *Id.* at 391.

The petitioners' claim that Laws 2004, chapter 200 violates Part II, Article 18 does not challenge a power the State Constitution has committed to the legislature. *See Pa. Sc. Boards Ass'n v. Ass'n of Sc. Adm'rs*, 805 A.2d 476, 485 (Pa. 2002). Under our State Constitution, and as the federal government conceded in *Munoz-Flores*, "no provision of the [Federal] Constitution demonstrably commits to the House of Representatives the determination of where a bill originated." *Munoz-Flores*, 495 U.S. at 390 n.3.

Moreover, answering this question does not require any sort of "initial policy determination" that courts should not make, or present "an unusual need for unquestioning adherence to a political decision already made." *Id.* (quotations omitted). Nor is there more danger of "multifarious pronouncements" in this context than in any other in which we determine the constitutionality of a law. *Id.* (quotation omitted). As the United States Supreme Court concluded in *Munoz-Flores*: "In short, this [question] has none of the characteristics that [have been] identified as essential to a finding that [it is] a political question." *Id.* at 396.

The Senate President and House Speaker also assert that whether the legislature passed Laws 2004, chapter 200 in derogation of RSA 14:8 and RSA 20:2-a is nonjusticiable. RSA 14:8 concerns the process by which bills are "enrolled." RSA 20:2-a concerns changes that may be made to a bill after it has passed both houses of the legislature and permits the director of legislative services to review bills before they are printed. Upon the discovery of "any error or omission in the references to statutes, or other technical or clerical errors," the director is authorized "to make the necessary corrections." RSA 20:2-a.

We agree that because these statutes concern nonconstitutionally mandated legislative procedures and because the State Constitution grants the legislature the authority to establish such procedures, the question of whether the legislature violated these statutes is nonjusticiable.

The authority to adopt procedural rules for passing legislation is demonstrably committed to the legislative branch by Part II, Articles 22 and 37 of the State Constitution. *See Horton*, 149 N.H. at 144; *see also Bednar v. King*, 110 N.H. 475, 476 (1970). Part II, Article 22 of the State Constitution provides: "The house of representatives shall choose their own speaker, appoint their own officers, and settle the rules of proceedings in their own house." Part II, Article 37 of the State Constitution similarly grants the Senate the authority to "determine their own rules of proceedings."

We have twice addressed this principle in the context of judicial impeachment. *See Horton,* 149 N.H. at 144-45; *Petition of Judicial Conduct Comm.,* 145 N.H. 108, 111-12 (2000). In *Horton,* the question was whether the petitioners were entitled to reimbursement of attorney's fees incurred as a result of successfully defending themselves against impeachment. *Horton,* 149 N.H. at 142. The court held that this question presented a nonjusticiable political question because the impeachment of judges is demonstrably committed to the legislative branch by the constitution. *Id.* at 143. This authority, we ruled, included with it "the full authority to make, implement and interpret rules pertaining to impeachment" and the ancillary power to award attorney's fees. *Id.* at 144.

In *Petition of Judicial Conduct Comm.,* 145 N.H. at 111-12, for similar reasons, we declined to compel the House Judiciary Committee to allow counsel to be present at a deposition of a New Hampshire Judicial Conduct Committee employee, other than the employee's personal counsel.

We have not previously extended these rulings to statutes that codify legislative procedures. Courts in other jurisdictions have ruled that the question of whether the legislature violated such statutes is nonjusticiable. *See Board of Trustees v. Atty. Gen. of Com.,* 132 S.W.3d 770, 777 (Ky. 2004). As explained in N. SINGER, 1 STATUTES AND STATUTORY CONSTRUCTION § 7:4, at 609-11 (6th ed. 2002 rev.):

> The decisions are nearly unanimous in holding that an act cannot be declared invalid for failure of a house to observe its own rules. Courts will not inquire whether such rules have been observed in the passage of the act. The legislature by statute or joint resolution cannot bind or restrict itself or its successors to the procedure to be followed in the passage of legislation.

In *State ex rel. La Follette v. Stitt,* 338 N.W.2d 684, 686-87 (Wis. 1983), for instance, the court declined to rule upon whether legislation was invalid because neither the assembly nor the senate referred it to committee before its passage, as required by a statute governing legislative procedure. The court concluded that it would "not determine whether internal operating rules or procedural statutes have been complied with by the legislature in the course of its enactments," and would not address whether the procedural statute applied to the legislation. *Id.* at 687. The court held that it would "not intermeddle in what [it] view[s], in the absence of constitutional directives to the contrary, to be purely legislative concerns." *Id.* "If the legislature fails to follow self-adopted procedural

rules in enacting legislation, and such rules are not mandated by the constitution, courts will not intervene to declare the legislation invalid." *Id.*

Similarly, in *Malone v. Meekins*, 650 P.2d 351, 356 (Alaska 1982), the statute at issue concerned the circumstances under which the majority leader may serve as presiding officer *pro tempore*. In declining to address whether the legislature violated this statute, the court explained that when a statute "relates solely to the internal organization of the legislature, a subject which has been committed by our constitution to each house, ... proper recognition of the respective roles of the legislature and the judiciary requires that the latter not intervene." *Malone*, 650 P.2d at 356.

■ The court concluded that whether the legislature violated the statute was a nonjusticiable political question because selection and removal of officers was textually committed to the legislature by the constitution and because it would be highly intrusive for the court to assume responsibility for overseeing this process. *Id.* at 357; *see also Abood v. League of Women Voters of Alaska*, 743 P.2d 333, 339-40 (Alaska 1987); *Moffitt v. Willis*, 459 So. 2d 1018, 1021-22 (Fla. 1984). As we find this reasoning persuasive, we conclude that the question of whether the legislature violated RSA 14:8 and RSA 20:2-a, statutes codifying its own procedural rules, is nonjusticiable.

■ We hold that the question of whether the procedures set forth in Part II, Articles 2, 20, 37 and 44 were violated is justiciable, however. Part II, Article 2 of the State Constitution vests the "supreme legislative power" in the Senate and House. Part II, Articles 20 and 37 of the State Constitution provide that each branch of the legislature must have a quorum to do business. Part II, Article 44 provides, in pertinent part: "Every bill which shall have passed both houses of the general court, shall, before it becomes a law, be presented to the governor." N.H. CONST. pt. II, art. 44. Claims regarding compliance with these kinds of mandatory constitutional provisions are justiciable. *See Bednar*, 110 N.H. at 476; *see also Bezio v. Neville*, 113 N.H. 278, 280 (1973). While we will not inquire into "every allegation of procedural impropriety in the passage of legislation," when the question presented "is whether or not a violation of a mandatory constitutional provision has occurred, it is not only appropriate to provide judicial intervention, ... we are mandated to do no less." *Consumer Party of Pennsylvania*, 507 A.2d at 334.

## III. Part II, Article 18

### A. Standard of Review and Principles of Construction

Because the question of whether Laws 2004, chapter 200 violates RSA 14:8 and RSA 20:2-a is nonjusticiable, we confine our review to the petitioners' constitutional claims, which are justiciable. We begin with their assertion that Laws 2004, chapter 200 violates the State Origination Clause. *See* N.H. CONST. pt. II, art. 18. Whether Laws 2004, chapter 200 is unconstitutional is a question of law, which we review *de novo*. *See Linehan v. Rockingham County Comm'rs*, 151 N.H. 276, 278 (2004).

We are guided by the following general principles of construction. "In reviewing a legislative act, we presume it to be constitutional and will not declare it invalid except upon inescapable grounds." *Petition of Judicial Conduct Comm.*, 151 N.H. at 125 (quotation omitted). "In other words, we will not hold a statute to be unconstitutional unless a clear and substantial conflict exists between it and the constitution." *Id.* (quotation omitted).

The presumption that attaches in favor of the constitutionality of a statute with respect to its subject matter also attaches with respect to its form and the process by which it was enacted. When reviewing a challenge to a statute's enactment, we look to the journals of the House and Senate "as conclusive evidence of the proceedings" in the legislature. *Bezio*, 113 N.H. at 280. "The presumptive validity of a statute will be overcome only if the journals give a clear indication that constitutionally required procedures were not followed." *Id.* "[T]he absence of any indication that the required procedures were followed in the face of clear evidence that such steps were not followed" will render the statute unconstitutional. *Id.* at 281. Because the journals are the "conclusive evidence of the proceedings . . . of the legislature," *id.* at 280, we reject the petitioners' assertion that the trial court erred by failing to hold an evidentiary hearing in this case.

When interpreting a constitutional provision, we examine its purpose and intent. *Petition of Below*, 151 N.H. at 139. By reviewing the history of the constitution and its amendments, the court endeavors "to place itself as nearly as possible in the situation of the parties at the time the instrument was made, that it may gather their intention from the language used, viewed in the light of the surrounding circumstances." *Id.* (quotation omitted). "The language used by the people in the great paramount law which controls the legislature as well as the people, is to be always understood and explained in that sense in which it was used at the time

when the constitution and the laws were adopted." *Id.* (quotation and ellipsis omitted).

### B. History and Purpose of Part II, Article 18

Part II, Article 18, entitled "Money Bills to Originate in House," provides: "All money bills shall originate in the house of representatives; but the senate may propose, or concur with, amendments, as on other bills."

This provision had its genesis in a provision in the 1776 temporary constitution, which provided "[t]hat all bills, resolves, or votes for raising, levying, and collecting money originate in the house of representatives." *Opinion of the Justices*, 70 N.H. 642, 642 (1901) (quotation omitted). In the succeeding constitution of 1784, this provision became: "All money bills shall originate in the house of representatives; but the senate may propose or concur with amendments, as on other bills." *Id.* Although the language changed between the 1776 temporary constitution and the 1784 constitution, this change did not "indicate an intention of [the constitution's] makers to change the meaning or construction of the original provision in the constitution of 1776 as to raising, levying, or collecting money." *Id.* Rather, the language was changed merely "to make that provision more concise." *Id.*

Part II, Article 18 is similar to Article 1, Section 7 of the Federal Constitution, which provides: "All bills for raising revenue shall originate in the House of Representatives"; it is also the same as a provision in the Massachusetts Constitution of 1780, *see* S. MARSHALL, THE NEW HAMPSHIRE STATE CONSTITUTION A REFERENCE GUIDE 139 (2004). *See Opinion of the Justices*, 102 N.H. 80, 82-83 (1959); *In re Opinion of the Justices*, 152 N.E.2d 90, 95 (Mass. 1958). Although Part II, Article 18 refers to "money bills" and the Origination Clause of the Federal Constitution refers to "bills for raising revenue," authorities from the time indicate that the phrases are "exact[ ] equivalent[s]." *Opinion of the Justices*, 126 Mass. 557, 593 (1878).

The requirement that all "money bills" or "bills for raising revenue" originate in the house stemmed from "Parliament's long struggle with the Crown for the control of the purse strings of the empire." SINGER, *supra* § 9:6, at 629; *see Opinion of the Justices*, 126 Mass. at 567-78. "The requirement . . . evolved from the exclusive right to originate such bills . . . vested in the popularly elected English House of Commons as protection against the hereditary House of Lords." *Opinion of the Justices*, 233 A.2d 59, 62 (Del. 1967); *see Opinion of the Justices*, 126 Mass. at 567-78.

The limitation "expresses a preference for keeping the taxing power as close as possible to those subject to it, since lower houses are customarily larger than upper houses and therefore presumably more representative in character." SINGER, *supra* at 629; *see also* THE FEDERALIST No. 58 (James Madison). The requirement that "money bills" or "bills for raising revenue" originate in the house reflects "a belief that the branch of government closest to the people will be more watchful and cautious in the imposition of taxes and thus should be the source of those bills." *Bobo v. Kulongoski*, 107 P.3d 18, 23 (Or. 2005) (quotation omitted). "[I]t was a maxim that the people ought to hold the purse strings." 1 JOURNAL OF THE FEDERAL CONVENTION 158 (E.H. Scott ed. 1894).

The history of the Federal Origination Clause is revealing. The Federal Origination Clause was a centerpiece of the 1787 Constitutional Convention. Jipping, *TEFRA and the Origination Clause: Taking the Oath Seriously*, 53 BUFF. L. REV. 633, 648 (1986). The framers gave the house of representatives the power to originate bills for raising revenue "as part of the 'Great Compromise' that ended the controversy over state suffrage." Note, *Special Assessments and the Origination Clause: A Tax on Crooks?*, 58 FORDHAM L. REV. 447, 449 (1989). Through the "Great Compromise," the framers agreed to allow each State to have an equal vote in the senate in exchange for proportional representation in the house. *Id.*; *see also* Jipping, *supra* at 653. "As a concession to the larger states, each state would exercise an equal vote in the Senate, but the Senate would have no power to alter or amend money bills." Note, *supra* at 449-50. "At first, the proponents of the origination clause jealously guarded its dual elements of origination and amendment of appropriation and revenue bills as powers reserved to the House." Jipping, *supra* at 649. As the convention went on, the framers gave the senate the power to amend revenue bills and, eventually, the power to originate appropriation bills. *Id.* at 658-63; *see also* Note, *supra* at 450.

The final version of the Federal Origination Clause accomplished two purposes. Jipping, *supra* at 648. First, it ensured that the "branch of the national legislature most representative of the people—the House of Representatives—would have to take the political initiative of taking more money from the people through taxation." *Id.* at 649. Additionally, it was "one of several important counterpoises to the additional authorities to be conferred upon the Senate, such as the trying of impeachments, confirmation of executive appointments, and ratification of treaties." *Id.* at 648-49 (quotation omitted).

## C. Meaning of "Money Bill"

It has been the practice of the State of New Hampshire since 1784 to interpret "money bill" to mean "rais[ing] money by direct taxation." *Opinion of the Justices*, 102 N.H. at 82; *see* MARSHALL, *supra* at 139. "[M]oney bills or bills for raising revenue are confined to bills which levy taxes in the strict sense of the word, and do not apply to bills which incidentally raise revenue or involve appropriation of state money." *Opinion of the Justices*, 102 N.H. at 82. "This limited and strict construction of the constitutional requirement that money bills or bills for raising revenue shall originate in the lower house is supported by the overwhelming weight of authority." *Id.*

"Direct taxation means taxes upon polls and estates." *Opinion of the Justices*, 115 N.H. 304, 305 (1975). Thus, we have held that a bill that would impose a direct tax on parimutuel pools is not a "money bill" because it is not a direct tax on polls and estates. *Opinion of the Justices*, 116 N.H. 351, 353-54 (1976).

Our interpretation of the New Hampshire Origination Clause is consistent with the interpretation by federal courts of the Federal Origination Clause. *See United States v. Norton*, 91 U.S. 566, 569 (1875); *see also United States v. Mayo*, 26 F. Cas. 1230, 1231 (C.C.D. Mass. 1813). Like the State Origination Clause, the Federal Origination Clause "has been confined to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes which incidentally create revenue." *Norton*, 91 U.S. at 569 (quotation omitted).

"Raising revenue, in the context of the origination clause, implies that the purpose of a measure must be to increase revenue for the support of government through the operation of the taxing power." Jipping, *supra* at 666 (quotation omitted). Thus, numerous courts have held that bills that do not have this as their purpose are not "money bills" within the meaning of the Origination Clause. *See Bertelson v. White*, 65 F.2d 719, 722 (1st Cir. 1933) (bill that diminishes revenue of the government is not a bill to raise revenue under Federal Constitution); *Mobil Oil Corp. v. Township of Greenwich*, 2004 WL 3172517, at *9 (N.J. Tax Ct. 2004) (act that was not intended to raise revenue and anticipated that some property that was previously taxed would be exempt was not a bill to raise revenue).

We find the case of *State v. Lasky*, 165 A.2d 579 (Me. 1960), instructive. At issue was legislation that corrected errors and inconsistencies in public laws, including a statute that imposed a tax on quahogs. *Lasky*, 165 A.2d at 581-82. The correcting legislation included a provision that repealed the

quahog tax statute "and enacted as something new the same statute, identical in all respects apart from section numbers." *Id.* at 582. The Maine Supreme Judicial Court held that the correcting legislation did not violate the Maine Origination Clause because it was not a bill for raising revenue. *Id.* at 583. "[T]he repeal and enactment sections ... accomplish neither more nor less than the amendment of the original quahog tax statute by changing the assignment of section numbers in the Revised Statutes." *Id.* at 582. Had the correcting legislation created the quahog tax in the first instance, the court noted, it would have been a revenue bill. *Id.* at 581.

### D. Laws 2004, Chapter 200 is a Money Bill

When determining whether Laws 2004, chapter 200 is a "money bill," we begin by examining its purpose. Although the title of the bill states that its purpose was to "mak[e] technical corrections to the education funding formula," N.H.S. JOUR. 4 (2004), when we examine the statute's provisions, however, it becomes clear that it had a broader purpose.

■ Most significantly, Laws 2004, chapter 200 increased the rate from $3.24 on each $1,000 of the value of taxable property to $3.33 on each $1,000 of the value of taxable property. *Compare* Laws 2003, 241:11 *with* Laws 2004, 200:26; *see also* Laws 2004, 200:28-:29. As the education property tax is a direct tax on estates, and as this tax supports the State's obligation to fund an adequate education, we conclude that Laws 2004, chapter 200 raised revenue within the meaning of the Origination Clause. *See Opinion of the Justices*, 115 N.H. at 305; *Sirrell v. State*, 146 N.H. 364, 367 (2001). We hold therefore that it is a "money bill." We next consider whether it originated in the House as required by Part II, Article 18.

### E. Laws 2004, Chapter 200—Origination

There is no definitive guidance as to the meaning of the word "originate" as used in Part II, Article 18, or its counterpart in the Federal Constitution. *See United States v. Madison*, 712 F. Supp. 1379, 1383 (W.D. Wis. 1989).

The petitioners argue that because Laws 2004, chapter 200 began as and is designated a senate bill, it "originated" in the Senate. The petitioners, in effect, ask us to ignore the history of Laws 2004, chapter 200, as contained in the journals. While this may be appropriate in jurisdictions that adhere to the "enrolled bill doctrine," it is not appropriate in New Hampshire.

In jurisdictions that follow the enrolled bill doctrine, "the enrolled bill is conclusive proof of proper legislative action." SINGER, *supra* at 562. In

these jurisdictions, "no other evidence [is] admissible to establish that the bill was not lawfully enacted." *Id.* at 819. Thus, for example, in one of the only federal cases to overturn legislation because it violated the Origination Clause, the court in *Hubbard v. Lowe*, 226 F. 135, 139 (S.D.N.Y. 1915), *appeal dismissed*, 242 U.S. 654 (1917), refused to consult Congressional journals to contradict evidence of the bill's enrollment. Rather, the court determined the bill's origin by looking at its designation, S. 110, and its certification by the secretary of state that it had originated in the senate. *See Hubbard*, 226 F. at 139.

■ New Hampshire does not subscribe to the enrolled bill doctrine, however. *See Opinion of the Justices*, 76 N.H. 601, 603 (1911). We will use legislative journals, therefore, to determine whether the presumed validity of a bill is refuted. *See id.* We will not find legislation invalid, however, unless the journals clearly indicate that constitutional procedures were not followed. *Bezio*, 113 N.H. at 280.

The journals show that when Laws 2004, chapter 200 was first introduced, it was not a "money bill." As introduced in the Senate, it repealed and re-enacted certain provisions of the statewide property tax, but neither decreased nor increased the rate of taxation. N.H.S. JOUR. 4 (2004). Rather, like the legislation in *Lasky*, the bill as introduced made technical changes only to the existing tax statutes. *See Lasky*, 165 A.2d at 581-82.

The journals demonstrate that the "money bill" aspects of Laws 2004, chapter 200 were added to the legislation when the Conference Committee amended it. It was not until the Conference Committee amendments that the legislation increased the statewide property tax. *See* N.H.H.R. JOUR. 857, 864 (2004).

The Conference Committee was comprised of seven legislators, four from the House and three from the Senate. *See* N.H.S. JOUR. 1132 (2004). Pursuant to Senate Rule 19(a) from the 2003-2004 legislative session:

> Whenever there be any disagreement between the Senate and the House on the content of any bill or resolution, and whenever both bodies, voting separately, have agreed to establish a committee of conference, the President of the Senate shall appoint three members to the Senate conference committee on the bill and the Speaker of the House shall appoint four members to the House conference committee.

Generally,

> [a] conference committee . . . is two committees, one appointed by each house. It is normally appointed for a specific bill and its function is to gain accord between the two houses either by the recession of one house from its bill or its amendments or by the further amendment of the existing legislation or by the substitution of an entirely new bill.

SINGER, *supra* § 11:8 at 654. Amendments proposed by a conference committee are merely recommendations; they are not binding upon either the House or the Senate. *See* NATIONAL CONFERENCE OF STATE LEGISLATURES, MASON'S MANUAL OF LEGISLATIVE PROCEDURE § 670, at 469 (2000); *see also id.* § 770, at 559. A conference committee's report has no force or effect until agreed to by the House or Senate. *See id.* § 670, at 469. Once the House or Senate agrees to the report, it becomes the action of the house approving it. *See id.* "When the report of the committee on conference is adopted by either house, a message to that effect is sent to the other. When both houses have adopted the report, they have both approved the bill in its final form and it is ordered to enrollment." *Id.* § 771, at 560.

Here, the Conference Committee, made up of a majority of House members, retained nothing from the bill it received from the House. Instead, it recommended an entirely new bill that deleted everything after the enacting clause and added new language, including that which made it a money bill. *See* N.H.S. JOUR. 1219-62 (2004); *see also* N.H.H.R. JOUR. 857-67 (2004).

Significantly, the journals reveal that "the bill was first approved in its final form by the House." *Madison*, 712 F. Supp. at 1384; *see* N.H.S. JOUR. 1217-19 (2004); *see also* N.H.H.R. JOUR. 867, 898 (2004). Had the House believed that the bill, with the Conference Committee's amendments, invaded its institutional prerogative to originate "money bills," it could have rejected the Conference Committee's report. *See Munoz-Flores*, 495 U.S. at 403-04, 407 (Stevens, J., concurring). Instead, it approved it. *See* N.H.H.R. JOUR. 867 (2004). "[T]he House [was] in an excellent position to defend its origination power," had it believed that that power had been usurped. *Munoz-Flores*, 495 U.S. at 403 (Stevens, J., concurring).

█ Where, as here, House members made up a majority of the Conference Committee and the House was the first body to approve the "money bill" portion of Laws 2004, chapter 200, we cannot find "a clear

indication that constitutionally required procedures were not followed." *Bezio*, 113 N.H. at 280. Accordingly, while, on the facts presented, we consider this a close case, we decline to rule that Laws 2004, chapter 200 did not originate in the House.

*IV. Part II, Articles 2, 20, 37 and 44*

The petitioners next argue that Laws 2004, chapter 200 violates Part II, Articles 2, 20, 37 or 44 of the State Constitution because it contains the enrolled bills committee's amendments, which make it materially different from the bill the legislature passed. These material differences, the petitioners contend, demonstrate that the legislature delegated its legislative authority to the enrolled bills committee, which is contrary to Part II, Article 2. These differences, they contend, also show that the body that approved the changes did not represent a quorum of the House and Senate, as required by Part II, Articles 20 and 37, and that the bill the legislature passed was different from that which was presented to the Governor, which violates Part II, Article 44.

The petitioners assert that the following changes are material: (1) changing the word "excluding" to "including" in two places; and (2) adding the words "-2005 biennium" in one place. The petitioners concede that the remaining differences between SB 302 as passed by the legislature and SB 302 as enacted into law as Laws 2004, chapter 200, are not material. As the petitioners admit, these changes reflect corrections of typographical errors, and do not render Laws 2004, chapter 200 unconstitutional.

*A. Changing "Excluding" to "Including"*

The petitioners first contend that changing the word "excluding" to "including" in two places in SB 302 was a material change. The journals demonstrate that this change made SB 302 conform to the Conference Committee's spreadsheet. *See* N.H.S. JOUR. 1309-13 (2004); *see also* N.H.H.R. JOUR. 897 (2004). The journals further show that the Conference Committee intended its spreadsheet to govern, rather than the use of the word "excluding" in the text of SB 302. *See* N.H.H.R. JOUR. 897 (2004).

The journals are inconclusive, however, as to whether conforming SB 302 to the Conference Committee's intent reflected the legislature's intent. The "Clerk's Note" in the House Journal states that, "It was the intent of the Committee of Conference that the language include utility property in order to convey the results enumerated on the spreadsheet." N.H.H.R. JOUR. 897 (2004). The journal is silent as to whether the House intended this change. The Senate Journal is also silent on this subject. Although the

Senate Journal includes the Conference Committee's spreadsheet, it does so without commentary. *See* N.H.S. JOUR. 1309-13 (2004).

■ While the petitioners presume from this silence that changing the language of SB 302 to include utility property was contrary to the legislature's intent, we must indulge the opposite presumption. Unless the journals clearly indicate that the legislature failed to follow constitutionally mandated procedures, we must presume that it adhered to them. *See Bezio*, 113 N.H. at 280. Because the journals are inconclusive as to whether changing SB 302 to make it consistent with the Conference Committee's spreadsheet reflected the legislature's intent, we hold that they are insufficient to defeat the presumption that the legislature validly enacted Laws 2004, chapter 200.

While ordinarily we would not look beyond the journals to determine whether an enrolled bill has been constitutionally enacted, *see Opinion of the Justices*, 76 N.H. at 603, the petitioners have submitted transcripts of the debates in both houses of the legislature, to which the respondents have not objected. Although we do not use these transcripts to make any findings, we note that they suggest that making SB 302 consistent with the Conference Committee's spreadsheet reflected the legislature's intent. We further observe that both the House and Senate approved the enrolled bills committee's amendments, which further indicate that these amendments were consistent with legislative intent. *See* N.H.S. JOUR. 1316-17 (2004); N.H.S. JOUR. 1340 (2004); *see also* N.H.H.R. JOUR. 899 (2004).

*B. Adding "-2005 biennium"*

The petitioners next assert that adding the phrase "-2005 biennium" to SB 302 was a material change. The version of SB 302 reported by the Conference Committee included the following provision: "Consumer Price Index Adjustments to the Base Cost Per Pupil Calculation. The base cost per pupil shall be adjusted by the average annual percentage rate of inflation for the 4 immediately preceding calendar years." In the Conference Committee's version, this provision did not refer to Laws 2003, 241:4, from which it was derived. Laws 2003, 241:4 provided that the base cost per pupil would be adjusted by the average annual percentage rate of inflation for the four immediately preceding calendar years "[f]or the 2004 fiscal year."

The enrolled bills committee amended SB 302 to state:

Consumer Price Index Adjustments to the Base Cost Per Pupil Calculation. Amend 2003, 241:4 to read as follows:

241:4 Price Index Adjustments to the Base Cost Per Pupil Calculation. For the 2004 [fiscal year] —2005 biennium, the base cost per pupil shall be adjusted by the average annual percentage rate of inflation for the 4 immediately preceding calendar years.

■ We hold that this change, on its face, was a technical change. As the petitioners concede, the enrolled bills committee may amend legislation to correct clerical or technical errors without violating the constitution. The enrolled bills committee changed the language of SB 302 to make it consistent with the legislature's intent that Laws 2003, 241:4 should continue for the next fiscal year. This change does not invalidate Laws 2004, chapter 200.

*Affirmed.*

DALIANIS, DUGGAN and GALWAY, JJ., concurred.