Merrimack
No. 2005-215

DANIEL M. HUGHES

v.

SPEAKER OF THE NEW HAMPSHIRE HOUSE OF REPRESENTATIVES & a.

Argued: May 3, 2005
Opinion Issued: June 2, 2005

*Brown, Olson & Gould, P.C.*, of Concord (*Bryan K. Gould* and *E. Maria Reinemann* on the brief, and *Mr. Gould* orally), for the plaintiff.

*Orr & Reno, P.A.*, of Concord (*James P. Bassett & a.* on the brief, and *Mr. Bassett* orally), and *Richard J. Lehmann*, senate legal counsel, by brief, and *Patrick Donovan*, house legal counsel, by brief, for the defendants.

*Kelly A. Ayotte*, attorney general (*Daniel J. Mullen*, associate attorney general, on the brief), for the State, as *amicus curiae*.

DUGGAN, J. The defendants appeal the ruling of the Superior Court (*McGuire*, J.) that they violated Part I, Article 8 of the State Constitution and RSA chapter 91-A when they privately negotiated a compromise of Senate Bill (SB) 302. This appeal requires that we carefully consider: the public's constitutional right of access to governmental proceedings, *see* N.H. CONST. pt. I, art. 8; the public's statutory right to know, *see* RSA ch. 91-A (2001 & Supp. 2004); the legislature's constitutional authority to adopt its own rules, *see* N.H. CONST. pt. II, arts. 22, 37; the legislature's right to free deliberation and debate, *see* N.H. CONST. pt. I, art. 30; and the constitutional principle of separation of powers, *see* N.H. CONST. pt. I, art. 37. We reverse.

We hold that whether the defendants violated the statutory provisions governing the public's right to know is a political question not subject to our review. Answering this question would infringe upon the legislature's exclusive constitutional authority to adopt and enforce its own rules of procedure.

However, whether the defendants violated Part I, Article 8 is not a political question. We further hold that the defendants did not violate that constitutional provision. In context, the constitutional import of free legislative debate outweighs the public's right of access to the disputed negotiations. Considering the public and open nature of the legislative process in this case and the public access to the records and debates, we

believe that the legislature could properly have determined that denying the public access to the negotiations at issue was reasonable.

*I. Background*

The defendants are the Speaker of the New Hampshire House of Representatives (House), the President of the New Hampshire Senate (Senate), the General Court of the State of New Hampshire, the House Conference Committee on SB 302, and the Senate Conference Committee on SB 302. The plaintiff is Representative Daniel M. Hughes, a member of the House.

The instant dispute concerns the enactment of SB 302, a 2004 bill concerning school funding. We briefly summarize the legislative history of SB 302 below. We incorporate by reference the more detailed history set forth in *Baines v. N.H. Senate President*, 152 N.H. 124, 126-27 (2005).

SB 302 was introduced in the Senate on January 7, 2004, to "make technical corrections to the education funding formula." *Baines*, 152 N.H. at 126 (quotation and brackets omitted). Before passing the bill on March 17, 2004, the Senate rejected an amendment that would have raised the existing cigarette tax rate. *Id.*

The House amended SB 302 to increase the existing cigarette tax rate. *Id.* A committee of conference was appointed for SB 302 when the Senate did not concur with the House amendment. *Id.* Consistent with legislative rules, the Senate President appointed three Senate conferees and the Speaker of the House appointed four House conferees. *Id.* at 138.

A committee of conference or "conference committee," "is two committees, one appointed by each house. It is normally appointed for a specific bill and its function is to gain accord between the two houses either by the recession of one house from its bill or its amendments or by the further amendment of the existing legislation or by the substitution of an entirely new bill." N. SINGER, 1 STATUTES AND STATUTORY CONSTRUCTION § 11:8, at 654 (6th ed. 2002 rev.). "Although the managers on the part of each House meet together as one committee they are in effect two separate committees, each of which votes separately and acts by a majority vote." *Id.* § 16A:4, at 934; *see* NATIONAL CONFERENCE OF STATE LEGISLATURES, MASON'S MANUAL OF LEGISLATIVE PROCEDURE § 770, at 558 (2000) (MASON'S).

"When the conferees, by majority vote of each group, have reached complete agreement ... they embody their recommendations in a report made in duplicate." SINGER, *supra* § 16A:4, at 936. The report may not be forwarded to the legislature unless the conferees have unanimously approved it. MANUAL OF THE NEW HAMPSHIRE GENERAL COURT 2003-2004 at 20. The report is then acted upon by each house of the legislature.

MASON'S, *supra* § 771, at 560. "When both houses have adopted the report, they have both approved the bill in its final form and it is ordered to enrollment." *Id.*

"The conference committee process is older than Congress itself. State legislatures used conference committees before 1789 to reconcile differences between the chambers of their bicameral legislatures." W. OLESZEK, CONGRESSIONAL PROCEDURES AND THE POLICY PROCESS 255 (6th ed. 2004). "The Massachusetts Bay Colony ... held the first recorded conference committee in the New World as early as 1645." L. LONGLEY & W. OLESZEK, BICAMERAL POLITICS: CONFERENCE COMMITTEES IN CONGRESS 29 (1989).

"Almost immediately upon the convening of the first session of the First Congress in 1789, the Senate and the House considered rules providing for conferences between the two chambers." *Id.* at 30. The first congressional conference committee met on May 14, 1789, to resolve an issue of congressional etiquette: How should the Congress address the President of the United States? *Id.* at 31. "One of the first bills passed by Congress, H.R. 15 (introduced on July 22, 1789), required a conference committee to iron out differences between the House and Senate versions." Roberts, *Are Congressional Committees Constitutional?: Radical Textualism, Separation of Powers, and the Enactment Process*, 52 CASE W. RES. L. REV. 489, 545 (2001).

Committees of conference "are an important element of the constitutional concept of bicameralism." *Id.* at 547. "While it is sometimes possible to reconcile differences between the chambers by amendment . . ., this is rarely the case for important legislation." *Id.* "It is usually the conference committee, a quintessential bicameral body, that carries out the crucial constitutional function of preparing from the disparate House and Senate bills one final set of legislative provisions for final passage." *Id.* at 547-48.

The committee of conference in this case met publicly on three dates: May 17, 2004; May 18, 2004; and May 19, 2004. The Senate and House conferees met jointly on these dates, with members of the public and press in attendance.

Before each of the public meetings convened, House conferees met with the Speaker of the House in his office to discuss SB 302. Also present at these meetings were House legal counsel and various House members. These meetings were not publicly noticed and were not open to the public. During these non-public meetings, representatives for the House conferees communicated with the Senate President to negotiate a compromise of SB 302.

The trial court credited testimony that, at these non-public meetings, the House conferees "discussed and decided what to say during the noticed public meetings of the Committee of Conference." The court also credited testimony that the conferees "agreed ... on a 'script' of what they would say in the public meeting." During one of the committee of conference's public meetings, a conferee indicated that she disapproved of conferees scripting their public comments in advance.

The Senate conferees also met with the Senate President in his office before at least one public meeting of the committee of conference. Additionally, pairs of Senate conferees met in person or by telephone to discuss the bill. Neither the Senate President's meeting with the Senate conferees nor the discussions between pairs of Senate conferees were publicly noticed or open to the public.

The committee of conference reached a final compromise on SB 302 on May 19, 2004. The committee's report recommended amending SB 302 to increase the uniform rate at which the statewide property tax was imposed. *Baines*, 152 N.H. at 126. The report did not recommend changing the rate of the cigarette tax. *See* N.H.H.R. JOUR. 857-67 (2004).

At the May 19, 2004 public meeting of the committee of conference, three conferees explained that they could not support the committee's report. These conferees were replaced, and the replacement conferees signed the report.

The legislature considered the committee's report in public session on May 25, 2004. *See* N.H.S. JOUR. 1219-64 (2004); *see also* N.H.H.R. JOUR. 857-68 (2004). Before the House voted on the report, the plaintiff asked the Speaker of the House whether RSA chapter 91-A applied to the committee of conference. The Speaker of the House answered:

> If ... both sides were meeting, yes. But in the situation where either the House meets by themselves or the Senate side meets by themselves, that does not constitute a quorum of the committee of conference. Because the committee of conference has to act as a whole. So that the term "meeting" under [RSA chapter 91-A] ... refers to a convening of a quorum of any committee.

The plaintiff then moved to discharge the committee of conference for SB 302 on the ground that it violated House Rule 110, which requires all meetings of any House or Senate committee to be open, and RSA chapter 91-A. The Speaker of the House again ruled that neither House Rule 110 nor RSA chapter 91-A applied to "either the House and/or the Senate meeting independently amongst themselves." The plaintiff sought to appeal this decision to the House, but later withdrew his appeal and spoke

against SB 302. *See* MANUAL OF THE NEW HAMPSHIRE GENERAL COURT 2003-2004 at 121.

Following debate, the House voted by a margin of 195 to 165 to adopt the committee of conference report. *See* N.H.H.R. JOUR. 865-67 (2004). The Senate also adopted the report. *See* N.H.S. JOUR. 1264 (2004). SB 302 became law without the Governor's signature on June 9, 2004. *Baines*, 152 N.H. at 127.

On June 23, 2004, the plaintiff brought the instant action alleging that the defendants had violated RSA chapter 91-A and Part I, Article 8 of the State Constitution by excluding him and other members of the public from the separate meetings of the House and Senate conferees. The plaintiff asked the trial court to invalidate the committee of conference report, void SB 302, and award him reasonable attorney's fees and costs.

The trial court found in the plaintiff's favor, ruling "that the conduct of the negotiations on SB 302 violated Part I, Article 8 of the New Hampshire Constitution and the Right-to-Know law." The court found that the conferees did not substantively negotiate SB 302 during the publicly noticed meetings. Rather, the "*de facto* meetings of the Committee of Conference occurred with the House and Senate conferees meeting separately and negotiating through intermediaries for the purpose of negotiating the school funding bill outside the public eye and without public scrutiny." This conduct, the court ruled, violated the plaintiff's constitutional and statutory right to know. *See* N.H. CONST. pt. I, art. 8; *see also* RSA ch. 91-A.

The court declined, however, to invalidate SB 302, finding that "[u]nder the circumstances, [this was] not warranted or wise and perhaps not even possible." As the court noted, "all but one of the monetary distributions called for in SB 302" had been made, "and the final distribution [was] due to be made on April 1, 2005." The court determined that "[t]o invalidate the report, or the legislation resulting from it, would disrupt the monetary distribution upon which the school districts of the State are, no doubt, relying." The court awarded the plaintiff reasonable attorney's fees and costs, however, finding that "there can be no doubt that Senate and House leadership and committee members" knew or should have known that their conduct violated RSA chapter 91-A.

On appeal, the defendants argue that the trial court erroneously denied their earlier motion to dismiss, in which they had argued that the plaintiff's claims were not justiciable. Alternatively, the defendants contend that the trial court erred when it found that they had violated RSA chapter 91-A and Part I, Article 8. We discuss these arguments in turn.

## II. Justiciability

We first address whether the plaintiff's claims under Part I, Article 8 and RSA chapter 91-A, the Right-to-Know Law, are nonjusticiable political questions. This is a question of law, which we review *de novo*. *See Carbone v. Tierney*, 151 N.H. 521, 533 (2004).

■ "The nonjusticiability of a political question derives from the principle of separation of powers. The justiciability doctrine prevents judicial violation of the separation of powers by limiting judicial review of certain matters that lie within the province of the other two branches of government." *Petition of Judicial Conduct Comm.*, 151 N.H. 123, 128 (2004) (quotation and citation omitted). Where there is such commitment, we must decline to adjudicate the matter to avoid encroaching upon the powers and functions of a coordinate political branch. *Id.* "Deciding whether a matter has in any measure been committed by the Constitution to another branch of government ... is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the [State] Constitution." *Baker v. Carr*, 369 U.S. 186, 211 (1962).

■ "A controversy is nonjusticiable—*i.e.*, involves a political question— where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Petition of Judicial Conduct Comm.*, 145 N.H. 108, 111 (2000) (quotations and ellipsis omitted); *see Baker*, 369 U.S. at 217.

### A. RSA Chapter 91-A

We first examine the claim that the defendants violated RSA chapter 91-A. The plaintiff asserts, and the trial court found, that because most of the deliberations, negotiations and resolution of the differences regarding SB 302 took place outside of the public meetings, RSA chapter 91-A was violated.

RSA 91-A:2, II (Supp. 2004) provides that "[a]ll public proceedings shall be open to the public, and all persons shall be permitted to attend any meetings of those bodies or agencies." The term "public proceedings" refers to, among other things, proceedings of "[t]he general court including executive sessions of committees." RSA 91-A:1-a, I(a) (Supp. 2004).

For the purposes of this section, a "meeting" is "the convening of a quorum of the membership of a public body, as provided in RSA 91-A:1-a, to discuss or act upon a matter or matters over which the public body has

supervision, control, jurisdiction or advisory power." RSA 91-A:2, I (Supp. 2004). A meeting does not include, however, "[a]ny chance meeting or a social meeting neither planned nor intended for the purpose of discussing matters relating to official business and at which no decisions are made." RSA 91-A:2, I(a) (Supp. 2004). Nor does it include "[c]onsultation with legal counsel" or a "caucus consisting of elected members of a public body of the same political party who were elected on a partisan basis." RSA 91-A:2, I(c), (d) (Supp. 2004).

RSA 91-A:2, II also requires that such meetings be publicly noticed. With respect to meetings of a legislative committee, the statute requires that "publication [be] made pursuant to the rules of the house of representatives or the senate, whichever rules are appropriate." RSA 91-A:2, II.

We begin by determining whether resolving the plaintiff's Right-to-Know Law claim will usurp authority that the State Constitution textually commits to the legislature.

■■ Part II, Articles 22 and 37 of the New Hampshire Constitution contain textually demonstrable commitments to the House and Senate to adopt their own "rules of proceedings." *Baines*, 152 N.H. at 130-31 (quotation omitted). Such rulemaking authority "is a continuous power absolute." *Paisner v. Attorney General*, 458 N.E.2d 734, 739 (Mass. 1983). This means that "each branch of each successive Legislature may proceed to make rules without seeking concurrence or approval of the other branch, or of the executive, and without being bound by action taken by an earlier Legislature." *Id.* The legislature, alone, "has complete control and discretion whether it shall observe, enforce, waive, suspend, or disregard its own rules of procedure." *Des Moines Register v. Dwyer*, 542 N.W.2d 491, 496 (Iowa 1996); *see* MASON'S, *supra* § 13, at 22-23.

■ The same is true of statutes that codify legislative procedural rules. *See Baines*, 152 N.H. at 132; *see also Board of Trustees v. Atty. Gen. of Com.*, 132 S.W.3d 770, 777 (Ky. 2004). Statutes relating to the internal proceedings of the legislature "are not binding upon the Houses .... Either branch, under its exclusive rule-making constitutional prerogatives, is free to disregard or supersede such statutes by unicameral action." *Paisner*, 458 N.E.2d at 740; *see* SINGER, *supra* § 7:4, at 609-11.

■ "[C]ourts generally consider that the legislature's adherence to the rules or statutes prescribing procedure is a matter entirely within legislative control and discretion, not subject to judicial review unless the legislative procedure is mandated by the constitution." *State ex rel. La Follette v. Stitt*, 338 N.W.2d 684, 687 (Wis. 1983). Thus, in *Baines*, 152

N.H. at 132, we held that whether the legislature violated RSA 14:8 (2000) and RSA 20:2-a (2000) in enacting SB 302 was a nonjusticiable political question. These statutes, we explained, "concern nonconstitutionally mandated legislative procedures." *Baines*, 152 N.H. at 130. "[B]ecause the State Constitution grants the legislature the authority to establish such procedures, the question of whether the legislature violated these statutes is nonjusticiable." *Id.*

Courts throughout the country have found that whether a legislature has violated the procedures of a state right-to-know law is not justiciable. In *Abood v. League of Women Voters of Alaska*, 743 P.2d 333, 339-40 (Alaska 1987), for instance, the Alaska Supreme Court ruled that whether, by holding closed meetings, members of the legislature violated the Alaska Open Meetings Act was nonjusticiable. The Alaska Constitution, like the New Hampshire Constitution, "expressly commits to the legislature authority to adopt its own rules of procedure." *Abood*, 743 P.2d at 337. The Alaska Supreme Court reasoned that as the open meetings act "merely establishes a rule of procedure concerning how the legislature has decided to conduct its business," and as the constitution grants the legislature authority to enact its own rules of procedure, to hold the open meeting act claim justiciable would "place[] the judiciary in direct conflict with the legislature's constitutionally authorized rulemaking prerogative." *Id.* at 338, 339.

The Tennessee Court of Appeals employed similar reasoning in *Mayhew v. Wilder*, 46 S.W.3d 760 (Tenn. Ct. App. 2001). One question in that case was whether the general assembly had violated the state open meetings act. *Mayhew*, 46 S.W.3d at 768. The court first concluded that the open meetings act did not apply to the legislature. *Id.* at 770. The court then observed that even if the legislature intended to bind itself by the open meetings act when the act was passed, "the act would not bind a subsequent [legislature]." *Id.* As the court explained, "It is constitutional, and not statutory, prohibitions which bind the legislature." *Id.* (quotation omitted). Thus, "[b]inding the Legislature with procedural rules passed by another General Assembly would violate [the constitution]'s grant of the right to the Legislature to determine its own rules." *Id.*

The Florida Supreme Court in *Moffitt v. Willis*, 459 So. 2d 1018, 1021-22 (Fla. 1984), declined to decide whether the legislature violated open meeting procedures set forth in the legislature's rules, despite a statute requiring legislative committees to abide by these rules. In that case, thirteen newspaper-publishing companies sued the speaker of the house and senate president, alleging that they had violated a Florida statute that required legislative committees to abide by the legislature's procedural rules. *Moffitt*, 459 So. 2d at 1019, 1021. The procedural rules mandated

that all committee meetings "shall be open to the public." *Id.* at 1021 (quotation omitted). The Florida Supreme Court ruled that the statutory claim was not justiciable. "While the judiciary certainly has the power to determine what effect a statute has and to whom it applies as well as its constitutionality," that was not the issue, the court ruled. *Id.* at 1021-22. "We are not confronted with whether a statute applies, rather we are asked to allow the courts to determine when and how legislative rules apply to members of the legislature." *Id.* at 1022. "Just as the legislature may not invade our province of procedural rulemaking for the court system, we may not invade the legislature's province of internal procedural rulemaking." *Id.*

The plaintiff seeks to distinguish these cases, in part, by arguing that, unlike the procedures set forth in the right-to-know laws of other States, the procedures prescribed by the New Hampshire Right-to-Know Law are constitutionally mandated. He asserts that the 1976 amendment to Part I, Article 8 incorporated RSA chapter 91-A into the State Constitution. We disagree.

Part I, Article 8 provides:

> All power residing originally in, and being derived from, the people, all the magistrates and officers of government are their substitutes and agents, and at all times accountable to them. Government, therefore, should be open, accessible, accountable and responsive. To that end, the public's right of access to governmental proceedings and records shall not be unreasonably restricted.

N.H. CONST. pt. I, art. 8. The 1976 amendment added the last two sentences of this provision.

The journal of the 1974 Constitutional Convention reveals that the framers of the 1976 amendment did not intend to make Part I, Article 8 coextensive with RSA chapter 91-A. To the contrary, the framers intended that the amendment would be "a living article" that "chang[ed] with the times." JOURNAL OF CONSTITUTIONAL CONVENTION 174 (1974). As the amendment's sponsor explained: "The Legislature can make the law—the same law that it has now—and, if the Legislature sees fit that there are some areas that should be restricted or should be opened, the Legislature can do it, but they can't go and completely repeal the right to know." *Id.* The amendment was necessary, the sponsor argued, because it prevented the legislature from "completely do[ing] away with the right to know." *Id.* at 176.

■ Nothing in Part I, Article 8 requires the legislature to adopt particular internal legislative procedures to protect the public's right of access to public proceedings. *See Opinion of the Justices*, 111 N.H. 175, 177-78 (1971). Part I, Article 8 does not specify what legislative proceedings must be open to the public, or how the legislature must make these proceedings open to the public. *See id.* It merely provides that government "should" be open to the public and that the public's right of access to governmental proceedings must not be "unreasonably restricted."

By contrast, analogous provisions in other state constitutions are more specific than Part I, Article 8. For instance, Article III, Section 4(e) of the Florida Constitution provides:

> The rules of procedure of each house shall provide that all legislative committee and subcommittee meetings of each house, and joint conference committee meetings, shall be open and noticed to the public. The rules of procedure of each house shall further provide that all prearranged gatherings, between more than two members of the legislature, or between the governor, the president of the senate or the speaker of the house of representatives, the purpose of which is to agree upon formal legislative action that will be taken at a subsequent time, or at which formal legislative action is taken, regarding pending legislation or amendments, shall be reasonably open to the public.

Similarly, Article IV, Section 14 of the Oregon Constitution requires that the "deliberations of each house, of committees of each house or joint committees and of committees of the whole, shall be open." *See* MONT. CONST. art. V, § 10, cl. 3 ("The sessions of the legislature and of the committee of the whole, all committee meetings, and all hearings shall be open to the public."); GA. CONST. art. III, § 4 (in addition to legislative sessions, "all standing committees" of the legislature "shall be open to the public"); N.D. CONST. art. IV, § 14 ("All sessions of the legislative assembly, including the committee of the whole and meetings of legislative committees, must be open and public.").

Following our holding in *Baines*, we conclude that whether the defendants violated RSA chapter 91-A presents a nonjusticiable political question. As the New Hampshire Constitution commits to each house of the legislature the authority to adopt its own rules of proceedings and as there is no constitutional mandate that committee of conference meetings be open, the question of whether the defendants violated the procedures set forth in RSA chapter 91-A is nonjusticiable. *Baines*, 152 N.H. at 130-

32. "[P]roper recognition of the respective roles of the legislature and the judiciary requires that [we] not intervene." *Id.* at 132 (quotation omitted).

█ We emphasize that the question before us is not whether the Right-to-Know Law applies to the legislature. By the statute's express terms, it does. *See* RSA 91-A:1-a, I(a). The question before us is whether the legislature's alleged violation of the Right-to-Know Law is justiciable. We have concluded that this question is not justiciable because this legislative enactment "merely establishes a rule of procedure concerning how the legislature has decided to conduct its business," and the legislature has sole authority to adopt such rules of procedure. *Abood*, 743 P.2d at 339. "Of course, having made the rule, it should be followed, but a failure to follow it is not the subject of judicial inquiry." *Id.*

### B. Part I, Article 8

Although we have concluded that the plaintiff's RSA chapter 91-A claim is not justiciable, we reach the opposite conclusion with respect to his Part I, Article 8 claim. As we recognized in *Baines*, 152 N.H. at 132, "[c]laims regarding compliance with these kinds of mandatory constitutional provisions are justiciable." We have the responsibility to examine whether the defendants' conduct violated Part I, Article 8. *See Baines*, 152 N.H. at 132. It is our duty to interpret constitutional provisions and to determine whether the legislature has complied with them. *State v. LaFrance*, 124 N.H. 171, 177 (1983).

█ While the constitution vests the legislature with the authority to create its own rules of procedure, no provision of the constitution commits to the legislature the determination of whether the public's right of access to governmental proceedings has been unreasonably restricted. *See Baines*, 152 N.H. at 130. A legislative determination whether restrictions to public access are "reasonable" is subject to judicially discoverable and manageable standards. *See Union Leader Corp. v. Chandler*, 119 N.H. 442 (1979); *Petition of Union Leader Corp.*, 147 N.H. 603 (2002).

Our decision that the plaintiff's Part I, Article 8 claim is justiciable is consistent with our opinion in *Chandler*. In that case, we intimated that claims against the legislature brought under Part I, Article 8 are justiciable, while claims under RSA chapter 91-A are not. *Chandler*, 119 N.H. at 445. In that case, the Union Leader Corporation (Union Leader) brought a bill in equity under RSA chapter 91-A to compel the clerk of the House to produce a tape recording of certain House proceedings so that the Union Leader could duplicate the tape and use it for "voice stress analysis." *Id.* at 443 (quotation omitted). While a reporter for the Union Leader had been permitted to listen to the tape and to procure typed

transcripts of it, he had not been permitted to remove it from the House's possession. *Id.* at 444.

We held that this was not a "true Right-to-Know Law case under RSA ch. 91-A because the . . . [House] session was open to the public and press, an official journal was prepared of the proceedings, and written transcripts are available if the [Union Leader] or anyone else wishes to obtain them." *Id.* at 445. We further held that the House "could properly decide, consistent with the right of reasonable public access required by N.H. CONST. pt. I, art. 8, that its official tape should not be duplicated or subjected to a so-called voice stress analysis." *Id.*

We now turn to whether the defendants in this appeal could have properly decided, consistent with the right of reasonable access provided by Part I, Article 8, to negotiate the compromise of SB 302 in private.

*III. Analysis*

New Hampshire is one of only a handful of States with a constitutional provision that explicitly protects the public's right of access and/or the right to know. *See* Elison & Elison, *Comments on Government Censorship and Secrecy*, 55 MONT. L. REV. 175, 189 (1994). The United States Supreme Court has not yet recognized a federal constitutional or common law right to attend legislative sessions. *See Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) (plurality opinion) ("Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control.").

The concept of public access to legislative proceedings is relatively new. "In England, parliamentary debates were originally closed to the public on the theory that secrecy protected against interference by the Crown and later debates were closed to conceal the members' statements and votes from constituents." Elison & Elison, *supra* at 179. "Although common law recognized a limited right of the public to inspect government-held documents, the right to observe deliberations of governmental bodies did not exist." *Id.* at 179-80.

The English tradition of holding legislative debate in secret was carried on in the legislative bodies of Colonial America. *Abood*, 743 P.2d at 340. "In 1776, the names of the signers of the Declaration of Independence were withheld for six months, and both the Continental Congress and the Constitutional Convention excluded the public from all deliberations." Elison & Elison, *supra* at 180.

Before 1976, Part I, Article 8 provided: "All power residing originally in, and being derived from, the people, all the magistrates and officers of government are their substitutes and agents, and at all times accountable to them." N.H. CONST. pt. I, art. 8. Its companion provision, Part I, Article

7 of the State Constitution, provides, in pertinent part: "The people of this state have the sole and exclusive right of governing themselves as a free, sovereign, and independent state." Together with Part I, Article 7, Part I, Article 8 "express[ed] the American theory of government." *Opinion of the Justices*, 111 N.H. at 177. Neither Part I, Article 7 nor Part I, Article 8 required any "special method of . . . accountability." *Id.*

As we have previously noted, as amended in 1976, Part I, Article 8 now provides that "[g]overnment . . . should be open, accessible, accountable and responsive" and that "the public's right of access to governmental proceedings and records shall not be unreasonably restricted." N.H. CONST. pt. I, art. 8. The public's right of access to governmental proceedings thus is not absolute. *See Petition of Union Leader*, 147 N.H. at 604-05. It must yield to reasonable restrictions. N.H. CONST. pt. I, art. 8.

To determine whether restrictions are "reasonable," we balance the public's right of access against "the competing constitutional interests *in the context of the facts of each case.*" *Associated Press, Inc. v. Department*, 4 P.3d 5, 10 (Mont. 2000) (quotation omitted); *see also Petition of Union Leader*, 147 N.H. at 604.

In this case, we balance the public's right of access against two constitutional interests. The first such interest is the legislature's constitutional authority to make its own procedural rules. *See* N.H. CONST. pt. II, arts. 22, 37. As we have already discussed, the constitution vests in the legislature the exclusive authority to adopt its own procedural rules. *See Baines*, 152 N.H. at 130-31. As mentioned previously, procedural rules include the question of whether legislative business should be conducted in open or closed session. *Abood*, 743 P.2d at 337. Thus, although plaintiff's Part I, Article 8 claim is justiciable, the legislature's constitutional authority to make its own procedural rules counsels that we tread carefully when reviewing its determination to close certain conference committee negotiations to the public.

The second countervailing interest against which we balance the public's right-to-know is the legislature's constitutionally protected right to free deliberation and debate, to which we now turn. *See* N.H. CONST. pt. I, art. 30.

### A. The Speech and Debate Clause

The legislature's right to free deliberation and debate is protected by Part I, Article 30 of the New Hampshire Constitution, the Speech and Debate Clause. This clause provides: "The freedom of deliberation, speech, and debate, in either house of the legislature, is so essential to the rights of

the people, that it cannot be the foundation of any action, complaint, or prosecution, in any other court or place whatsoever." N.H. CONST. pt. I, art. 30.

Part I, Article 30 has been part of the New Hampshire Constitution since 1784. *See Keefe v. Roberts*, 116 N.H. 195, 198 (1976). New Hampshire was one of the first States "to preserve the principle that the legislature must be free to both speak and act without fear of criminal or civil liability." *Id.*

New Hampshire's Speech and Debate Clause "is the equivalent of the speech or debate clause, article I, section 6 of the United States Constitution." *Id.* Both the State and federal clauses appear to have emanated from the English Bill of Rights of 1689. *See Holmes v. Farmer*, 475 A.2d 976, 981 (R.I. 1984). "The English Bill of Rights was established to ensure that the freedom of speech and debates or proceedings in Parliament ought not to be impeached or questioned in any court or place out of Parliament." *Id.* (quotation omitted).

■■■ The framers of the Federal Constitution recognized that such a clause was "indispensably necessary" to enable the legislative branch to fulfill its constitutional duties. *Id.* (quotation omitted). The privileges secured by the Speech and Debate Clause are intended not to protect legislators "against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office, without fear of prosecutions, civil or criminal." *Coffin v. Coffin*, 4 Mass. 1, 27 (1808) (interpreting Massachusetts' Speech and Debate clause, which is nearly identical to New Hampshire's).

"In the American governmental structure the clause serves the ... function of reinforcing the separation of powers so deliberately established by the Founders." *United States v. Johnson*, 383 U.S. 169, 178 (1966). "[T]he central role of the ... Clause [is] to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *Gravel v. United States*, 408 U.S. 606, 617 (1972). The clause "was designed neither to assure fair trials nor to avoid coercion. Rather, its purpose was to preserve the constitutional structure of separate, coequal, and independent branches of government." *United States v. Helstoski*, 442 U.S. 477, 491 (1979). "The English and American history of the privilege suggests that any lesser standard would risk intrusion by the Executive and the Judiciary into the sphere of protected legislative activities." *Id.* The clause "protect[s] the integrity of the legislative process *by insuring the independence of individual legislators.*" *Id.* at 493 (quotation omitted). It assures that the legislature, as a co-equal branch of government, will have "wide freedom of speech, debate and deliberation

without intimidation or threats." *Gravel*, 408 U.S. at 616. "[T]hat the legislators can carry out their duties without being questioned in any other place allows the free flow of debate among legislators and the maximization of an effective and open exchange of ideas." *Holmes*, 475 A.2d at 982 (quotation omitted).

The clause "has been read broadly to effectuate its purposes." *Doe v. McMillan*, 412 U.S. 306, 311 (1973) (quotation omitted); *Keefe*, 116 N.H. at 198. It protects the legislature and individual legislators from incurring liability for "any act generally done in a session of the [legislature] . . . in relation to the business before it." *Keefe*, 116 N.H. at 199 (quotation omitted); *see Doe*, 412 U.S. at 312 (complaint barred by Speech or Debate Clause insofar as it sought relief from committee members and staff for introducing material at committee hearings that identified particular individuals, referring report to speaker of house, and for voting upon publication of report). For instance, under the Speech and Debate Clause, voting, drafting committee reports, and conduct at legislative committee hearings "may not be made the basis for a civil or criminal judgment against a [legislator] because that conduct is within the sphere of legitimate legislative activity." *Doe*, 412 U.S. at 311-12 (quotations omitted). "In order fully to effectuate the purpose and design of the . . . clause, it must be construed as an immunity from suit as well as a testimonial privilege." *Holmes*, 475 A.2d at 984 ("Inquiry by the court into the actions or motivations of the legislators in proposing, passing or voting upon a particular piece of legislation . . . falls clearly within the most basic elements of legislative privilege.").

In the Speech and Debate Clause, the framers recognized that the public has an interest in permitting legislators to deliberate privately. It is "obvious . . . that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front-page news." *Department of Interior v. Klamath Water Users Protective Assn.*, 532 U.S. 1, 8-9 (2001) (discussing deliberative process privilege under Federal Freedom of Information Act). The public has an interest not in protecting government secrecy, but in "protecting open and frank discussion among those who make [decisions] within the Government." *Id.* at 9.

The ability to meet in private may be necessary, in some circumstances, for good decision-making. As one commentator has noted, it is "no more practical to require [a legislative] committee to formulate its final determination, which is often a report of several hundred pages, in the presence of public representatives than it would be to require an appellate court to prepare its opinion in the presence of counsel." SINGER, *supra* § 11:13, at 660.

■ Arguably, the Speech and Debate Clause renders the plaintiff's Part I, Article 8 claim nonjusticiable. "The Clause is a … paradigm example of a textually demonstrable constitutional commitment of an issue to a coordinate political department." *Davis v. Passman*, 442 U.S. 228, 235 n.11 (1979) (quotation and brackets omitted). Because the defendants have not sought immunity from suit under the Speech and Debate Clause, nor argued that the plaintiff's claims are nonjusticiable under it, we need not decide these questions. That the clause potentially makes the plaintiff's claims nonjusticiable suggests that it has significant weight when balanced against the public's right of access.

## B. Factual Context

In addition to analyzing the countervailing constitutional interests implicated by this case, we also must examine the specific factual context in which the plaintiff's Part I, Article 8 claim arose.

Here, the public lacked access *only* to the private discussions of conferees and the negotiations that ultimately resulted in the final compromise of SB 302 in an otherwise public and open process. In context, this was a limited denial of the public right of access.

*All* of the legislative sessions at which SB 302 was discussed were posted, open to the public and recorded. *See Baines*, 152 N.H. at 126-27. Likewise, *all* of the formal meetings of the committee of conference, as well as the legislative sessions at which legislators debated the committee's report and voted upon it were posted, open to the public and recorded. *See id.* Further, the legislature's official journals published the committee's report and transcripts were prepared, and are publicly available, of the legislative debate on it. The plaintiff himself attended the public meetings of the committee of conference, and actively participated in the debate on its report.

The historical context in which the plaintiff's claim arose further demonstrates the limited nature of the denial of public access here. Historically, the *entire* conference committee process was closed to the public. *See* OLESZEK, *supra* at 256. At the federal level, "[u]ntil the mid-1970's, conference committees almost always met in secret sessions with no published record of their proceedings. The conference committee reports they produced revealed the results of the secret negotiations, but the bargaining and deliberations that led to these results were not formally disclosed." *Id.* In 1975, Congress adopted rules requiring open conference committee meetings, unless a majority of the conferees from either chamber voted in public to hold secret sessions. *Id.; see also* W. BROWN, JEFFERSON'S MANUAL AND RULES OF THE HOUSE OF

REPRESENTATIVES OF THE UNITED STATES NINETY-SIXTH CONGRESS § 548, at 253 (1979).

Despite these rule changes, congressional "[c]onferees still conduct much of their important business in secret." OLESZEK, *supra* at 256. As one long-time United States Senator commented:

> [W]hen we started the openness thing we found it more and more difficult to get something agreed to in the conferences, it seemed to take forever. So what did we do? . . . We would break up into smaller groups and then we would ask our chairman . . . to see if he could not find his opposite number on the House side and discuss this matter and come back and tell us what the chances would be of working out various and sundry possibilities.

*Id.* (quotation omitted).

Informal negotiating outside of public conference committee meetings is the norm, not the exception at the federal level. OLESZEK, *supra* at 269. "These negotiations commonly involve only key House and Senate staff aides, but may also include committee members, party leaders, and others. In addition, each chamber may engage in private preconference deal making, often only among majority party members without either the formal appointment of conferees or the participation of minority party members." *Id.*

Also, at the federal level, "[i]n some instances, preconference informal discussions may serve as the forum for major negotiations and the working out of compromises." LONGLEY & OLESZEK, *supra* at 57. When this occurs, "the subsequent conference meeting may well be staged almost along the lines of a script, with conferees for one House proposing an alternative that is quickly agreed to, followed by the other conferees making a proposal that is likewise concurred with, and so forth." *Id.* "Bargaining and compromise may be formally represented in the conference, but only as an agreed-upon reflection of preconference agreements." *Id.*

The New Hampshire committee of conference process bears some similarities to the federal process. Particularly when complex bills are at issue, New Hampshire legislators have engaged in informal negotiations outside of public committee of conference meetings. Sometimes, these kinds of informal negotiations take place before the committee of conference is appointed. As one legislator observed, "There's certainly a lot of conversation and formal and informal communication that goes on in a legislature, that's the only way we eventually get anything done."

Thus, when we examine the process by which SB 302 was enacted, we see that the public was denied access to only one part of that process—the informal negotiations that led to the final compromise of the bill. Moreover, when we examine the legislative environment, we see that informal negotiations are integral to the legislative process. Accordingly, the context in which the instant dispute arose weighs heavily against requiring the public access to the negotiations at issue.

### C. Conclusion

Having examined the competing constitutional provisions here, as well as the factual context of the plaintiff's claims, we hold that the public interest in protecting the legislature's prerogative to set its own procedural rules and engage in free and frank debate significantly outweighs the public's right of access to the contested negotiations. "If the suggested access were permitted," we believe that "government might become unduly cumbersome and candor among government officials stifled." *Petition of Union Leader*, 147 N.H. at 605. "It cannot be overlooked that the public's constitutional right of access is meant to satisfy an 'end'; to wit, that government should be open, accountable, accessible and responsive. This 'end' can and should be accomplished without severely curtailing the efficient operation of the government." *Id.* (citation omitted).

Under the specific factual circumstances of this case, the legislature could properly have determined that denying the public access to these negotiations was a reasonable restriction on the public's right of access. *See Chandler*, 119 N.H. at 445. We in no way retreat from the principle that "[g]overnment ... should be open, accessible, accountable and responsive" to the public. N.H. CONST. pt. I, art. 8. Rather, we believe that the generally public and open nature of the legislative process here and the availability of official journals of that process were sufficient to meet this constitutional mandate. *See Petition of Union Leader*, 147 N.H. at 606. Where, as here, the denial of access "is supported by a weighty State interest and is not a complete bar," the denial "can only be viewed as a reasonable restriction on the public's right of access." *Petition of Burling*, 139 N.H. 266, 271 (1994).

*Reversed.*

BRODERICK, C.J., and NADEAU, DALIANIS and GALWAY, JJ., concurred.